The People of the State of Illinois, Defendant-in-Error, v. Edwin J. Conrad, Plaintiff-in-Error.

Gen. No. 51,025.

First District, Fourth Division.

March 10, 1967.

Richard L. Verkler, of Chicago (Raymond, Mayer, Jenner & Block, of counsel), for plaintiff in error.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James Zagel, of counsel), for defendant in error.

MR. JUSTICE DRUCKER delivered the opinion of the court.

After a jury trial defendant was convicted of murder and was sentenced to the penitentiary for life. Defendant sued out a writ of error in the Supreme Court and the case was transferred to this court.

## Contentions on Appeal [1]

1. Defendant was not proven guilty beyond a reasonable doubt in that he was insane, as a matter of law, at the commission of the murder; and

2. Defendant did not receive a fair trial.

### Evidence

On January 4, 1960, defendant was a journeyman pipe-fitter, thirty-nine years of age. He resided on South Moody Avenue in Chicago with Margaret Conrad, his wife of approximately three and one-half years, and Mrs. Conrad's two daughters from a previous marriage: Margaret Nowicki, the decedent, who was fourteen years old, and Elaine Nowicki, age twenty.

According to the evidence adduced by the prosecution, Elaine Nowicki left early in the morning for work. Defendant then drove his wife to work and returned home. The decedent was at home and was supposed to accompany defendant to the union hall where the latter was to seek employment, as he had been laid off from his job two days before. At one-thirty that afternoon Elaine called home and spoke with defendant. She recalled that defendant said that he had gotten a new job and they discussed the possibility that she could now

---

[1] In its transfer order the Supreme Court stated that:

The defendant claims that his confession [a statement to the Chicago police] was improperly admitted in evidence. This argument is founded upon the contention that the confession was obtained after prolonged questioning at a time when the defendant was without counsel and also upon the claim that the defendant was denied his right to a prompt preliminary hearing. There is no showing that the defendant had ever requested counsel and the defendant did not object to the admission of the confession in the trial court on the ground that it was involuntary. We find no substantial constitutional question presented by this argument.

Therefore, we will not consider defendant's contention that his constitutional rights were violated nor will we consider his argument that the confession was involuntary.

38

ride to work with him. She also stated that defendant appeared anxious to end the conversation and, in response to her inquiry as to the reason for his haste, defendant replied that he had a great deal of housework. There was also some discussion of a gift that she was going to buy and defendant stated that Margaret was watching television. Margaret Nowicki's body was found at 6:00 p. m, that evening by her mother when she returned from work.[2] The body was prone on the living room floor with the hands outstretched, covered with a blanket. It was clothed in a torn white blouse, or pajama top, and a pair of panties which were inside out and backward. A babushka was worn loosely about the neck. The handle of a knife protruded from the area of the fifth rib, the blade having penetrated the heart and left lung in an oblique, upward direction. There were several contusions on the body: on the left side of the face, the front of the neck, the right thigh, right arm and at least one wrist. There was a swollen lip and a bloody discharge in the mouth, and a scratch appeared at the base of the left thumb. The contusions were sustained prior to death, not more than eighteen hours before infliction of the wound.

Defendant testified as to his activities in the house after driving his wife to work. He stated that when he returned home Margaret was still in bed; that he told her to dress so that she could accompany him to the union hall; that she expressed reluctance in leaving the house because a thirty-five year old neighbor was coming over for a "Christmas drink." Defendant advised her to forget any arrangement with the neighbor and Margaret made an indiscernible response. Defendant then testified that he drank a large amount of beer and wine, but Margaret still was not ready. He took a butcher

---

[2] The decedent's mother had great difficulty in entering the house and a neighbor had to be summoned to break the glass in the storm door.

knife from the kitchen and went to the basement to cut some cardboard to put on top of the Christmas tree box but, finding no cardboard in the basement, he returned to the kitchen. Defendant carried with him a length of clothesline from the basement. Defendant drank additional amounts of liquor, placed the knife on the table and attempted to remove knots from the clothesline. He called to Margaret again but she told him that he would have to come up and drag her out. After advising her that he would, she replied that he wouldn't dare. Defendant ascended the stairs and entered her bedroom. After he tugged on the corner of the quilt on the bed, she sat up in bed and playfully swung her fist at him. Defendant grabbed her hands and tied them together with the clothesline which he had brought from the basement. He loosened his hold on the line when she complained of being hurt, and Margaret began to tug on it. Defendant then dropped the clothesline, went downstairs to the kitchen and drank more whiskey. He then picked up the butcher knife, went into the living room and began counting Christmas cards hanging in an archway. He became dizzy and his head began to ache. He became aware that something was in back of him and swung around with the knife still in his hand. Defendant admitted that the decedent had on occasion snuck up behind him and tugged on his belt. (In his statement to the Chicago Police defendant admitted that he knew it was Margaret behind him and that he remembered only that the knife was going towards her.)

The next event that he was able to recall was the phone ringing (the call from his other daughter, Elaine). Defendant's only recollection of the conversation that transpired in that call was that it dealt with whether something was wrong, in that Elaine had perceived a strange quality in his speech. After concluding that telephone conversation defendant, becoming aware of an unusual silence in the house, walked into the living room and

found Margaret on the floor. Defendant touched her, discovered blood, determined that Margaret was dead and collapsed in bewilderment in a living room chair. He then went to the bedroom to obtain a blanket with which to cover the body. Subsequently he took some checks from a dresser, cashed them at a bank, packed a suitcase and took a taxi to the railway station. Defendant next was able to recall only that he found himself in a depot in Milwaukee.

Defendant remained in Milwaukee for six days, living under an assumed name in a hotel and drinking alcoholic beverages. He then told his story to a priest who advised him to go to the police, which defendant did. Defendant hailed a police car. The testimony with regard to defendant's statements to the police officers in Milwaukee are in conflict. Defendant testified that he told Officer Parys (the policeman who was driving the squad car which he hailed) that he was wanted in Chicago for the death of his daughter; that the officer questioned him as to his health and whether he hadn't been drinking too much; that he was finally placed in the squad car, driven into an alley, and further questioned as to his sobriety; that he asked Officer Parys to take him to someone with authority, and was then taken to the police station in another police vehicle (referred to by defendant as a "wagon") called by the policeman.

Officer Bernard Parys testified that defendant told him "I killed my stepdaughter." He further stated that defendant was immediately placed in the squad car, taken to a side street and then was conveyed in another vehicle to the police station. The next day defendant was taken into custody by the Chicago Police, who returned him to Chicago. Defendant's statement to them was rendered the following day.

With regard to defendant's relationship with his stepdaughters, Mrs. Conrad testified that:

41

At night when they used to go up to bed they used to kiss him good night and he used to say, "now, kiss me the way you are supposed to." He didn't want to kiss them like a dad. He wanted them to really kiss him.

A lot of times Margie [the deceased] would go to kiss him and back away and he would grab her and he would say, "Kiss me. Let me show you how." And he did the same with Elaine and Elaine said, "If you don't want me to kiss you, Dad, I won't kiss you at all," and she went upstairs.

Mrs. Conrad's testimony was corroborated by her daughter, Elaine.

On January 5 a postmortem examination was performed by two coroner's pathologists, one of whom was Dr. Leo Pevsner. He testified that in addition to the various other injuries to the body of the deceased as aforesaid, on the inside of the right thigh there was a contusion encompassing a circular area slightly less than one inch in diameter; the hymen was not intact and there was evidence that it had been perforated quite recently. Sperm was found in the vagina which, according to the witness' opinion, had been deposited within the last 48 to 72 hours.

**Opinion**

(1) Defendant contends that the trial court erred in failing to direct a verdict in his behalf since he was insane when the crime was committed, in that he suffered a blackout prior to the murder and regained his senses subsequent thereto when Elaine Nowicki phoned.

 The law presumes all men to be sane. People v. Kenzik, 22 Ill2d 567, 177 NE2d 162. The effect of that presumption is to require a defendant whose defense is insanity to introduce evidence tending to prove insanity. Only when that is done does the burden devolve upon the

prosecution to prove beyond a reasonable doubt that at the time of committing the act the accused had sufficient mental capacity to distinguish between right and wrong and that he was capable of exercising the power to choose between right and wrong. People v. Munroe, 15 Ill2d 91, 154 NE2d 225. According to defendant's evidence: he had been afflicted with severe headaches since suffering a head injury in 1957; he had also experienced a sudden temporary paralysis; in 1959 he suffered from a painful nerve condition in his neck which required hospitalization and extensive medical treatment. In addition, defendant stated that about two or three years prior to the incident he exhibited peculiar behavior; one winter evening, around midnight, he was discovered walking barefoot down a snow-covered alley, clad only in pajamas; and that other times he had done unusual things followed by a total lack of recall as to what had taken place. This was contradicted by the testimony of defendant's wife, who testified that after defendant had gone outside in his pajamas he returned to bed and stated that "it was awfully cold outside, and he knew where he was." Defendant's wife also related an incident which happened when defendant "had a few drinks" and stated that she knew of no other unusual incidents. According to the testimony of Mrs. Conrad, defendant drank often, could not hold his liquor but always knew what he was doing.

█ Defendant also adduced the testimony of Dr. William Haines, the court's psychiatric examiner who made a pretrial examination of defendant five months after the murder. He testified in response to a hypothetical question embodying defendant's version of the pertinent evidence and stated that in his opinion the actor in the hypothetical question at the time of the murder was unable to distinguish between right and wrong or to choose whether or not to do an act. However,

Dr. Haines admitted on cross-examination that the hypothetical actor became unable to choose between right and wrong only at the time he blacked out. Therefore, if the jury did not believe defendant's testimony as to the blackout, then Dr. Haines' answer to the hypothetical question would be of no significance in establishing insanity. Because of significant conflicts in the evidence, the jury could have disbelieved defendant's testimony as to the blackouts. While defendant testified that on various occasions he exhibited unusual behavior three years prior to the incident in question and didn't know what he was doing, his wife stated that defendant indicated to her that he always knew what he was doing. While defendant also testified that a moment after he felt someone pull or touch his back he remembered nothing until the telephone rang a few hours later, according to his own statement to the Chicago Police he blacked out after he swung around at Margaret and the knife was going towards her. As stated by the court in People v. Davis, 73 Ill App2d 386, 220 NE2d 75, where the defendant claimed to have no recollection of events which had occurred in several periods of his life (including such a period which included the date of the incident for which he was on trial), "his testimony as to 'amnesia' is open to serious question."

We find that the question of defendant's sanity at the time of the murder was properly submitted to the jury for its determination.

(2) Defendant also contends that he did not receive a fair trial, and in support thereof asserts that: (a) prejudicial photographs were erroneously admitted into evidence; (b) testimony as to the finding of sperm in the vagina of the deceased was improperly allowed; (c) the prosecution was allowed to improperly cross-examine defense witnesses; (d) improper restraints were placed upon defendant in his cross-examination of various witnesses for the prosecution; (e) the closing argument of

44

the prosecutor was improper and prejudicial; (f) the court improperly sustained objections to the closing argument of defendant; (g) the jury was improperly instructed; and (h) the trial judge was prejudiced against and hostile to defendant.

█ (a) The photos in question were of the body of the deceased from various angles and were introduced over the objections of defendant. These photos showing the disheveled appearance and bruised condition of the decedent were of substantial probative value in that if the jury disbelieved defendant's testimony as to the blackouts it could have concluded that defendant stabbed the decedent while assaulting her. Moreover, the photos corroborated the testimony of the prosecution witnesses as to the extent of the bruises on decedent's body. In People v. Jenko, 410 Ill 478, 102 NE2d 783, a murder case, the court held that photographs of the decedent were properly admitted and stated at page 482 that:

> The fact and cause of death, the number and location of the wounds, the manner in which they were inflicted, and the wilfulness of the acts in question are all material to the offense charged. . . . Evidence having a natural tendency to establish the facts in controversy should be admitted. A party cannot have competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury.

In People v. Hoffman, 32 Ill2d 96, 203 NE2d 873, the court held that the trial judge did not abuse his discretion in allowing photographs of a similar nature as those of the instant case to be introduced into evidence, stating at page 100:

> The photographs show the deceased from three different angles as she was found nude on the bed. Two of the pictures were taken from the left side of the body and show it exposed from the hips to the

45

head. The third picture was taken from the feet, which were spread apart wide and show the body exposed from the calves to the breasts.

. . . . . .

We are of the opinion that neither the admission nor exclusion of these photographs could, as a matter of law, be held to be an abuse of discretion. The pictures depict a brutal and intentional crime by a sadist and are bound to arouse feelings of horror and disgust in a normal person. We feel, however, that the description of the nature and extent of the wounds and burns inflicted upon the deceased could easily portray a much more gruesome image than that revealed by the photographs.

We find that the trial judge in the instant case did not abuse his discretion in allowing the photographs to be introduced into evidence.

(b) Testimony as to the finding of sperm in the vagina of the deceased was properly allowed. The test of admissibility of evidence is the connection of the facts proved with the crime charged, and whatever testimony tends directly to show the defendant guilty of the crime charged is competent although it tends to show him guilty of another offense. The party cannot by multiplying his crimes diminish the volume of competent testimony against him. People v. Cione, 293 Ill 321, 127 NE 646. The court in State v. Johnson, 37 NM 280, 21 P2d 813, held that testimony as to the extent of bruises on the decedent's body was properly admitted in a murder trial, stating at page 815 that:

The objection is clearly untenable. The criminal assault was a concomitant part of the transaction which resulted in the slaying of deceased, and was admissible under one of the well-recognized exceptions to the general rule excluding proof of other

46

independent crimes, both as tending to show motive for the homicide, and also as a part of the res gestae of the crime charged. . . .

The body of Margaret Nowicki bore extensive bruises, her clothing was torn and, in addition, her panties were inside out and backward. Even defendant would not have us believe that the decedent had dressed herself in this manner. From the evidence adduced by the prosecution the jury could have concluded that defendant had sexual intercourse with the deceased, and that the sexual intercourse was a motive for, or was part of the res gestae of, the homicide charged in the indictment.

(c) Defendant asserts that defense witnesses were improperly cross-examined. In his brief defendant argues that he was asked on cross-examination to describe what happened on various occasions when be blacked out; defendant stated that he did not know; and the court compelled him to answer and to describe events of which he had no personal knowledge; and that at no prior time in his testimony did defendant mention that he had ever exhibited "anomalous or uncontrollable behavior." According to the record, however, defendant testified that: "I sometimes found that I had trouble controlling myself if I took too much alcoholic beverages. . . . I would say that I was unable to control myself after taking too much alcohol on perhaps four or five occasions in four years." There is no reference to a blackout in any question by the prosecution. The prosecution merely sought to ascertain what defendant did when, with knowledge, he could not control his actions. In his answer defendant gave an articulate reply apparently based upon personal knowledge since there is no reference to what someone else told him he did. Therefore, the cross-examination of defendant was not improper.

■ Nor did the prosecution improperly cross-examine Dr. Haines. Upon an examination of the record we find

47

that the purpose of the cross-examination in question was either to explain, modify or discredit the testimony of the witness and was therefore proper. People v. Del Prete, 364 Ill 376, 4 NE2d 484.

(d) Defendant next contends that improper restraints were placed upon his cross-examination of various witnesses for the prosecution.

 One of the witnesses, Officer Parys, testified that when defendant first approached him he stated that he had killed his stepdaughter. Officer Parys admitted that prior to trial, to refresh his recollection, he referred to a notebook in which he had contemporaneously written defendant's statement to him, but the trial judge refused defendant's request to produce the notebook in court. However, on cross-examination the witness read aloud to the jury from Defendant's Exhibit 2 for identification, which was a report prepared by Officer Parys for his commanding officer, as follows:

> On Sunday, January 10, 1960, subject [defendant] stopped us on North Third and West Wisconsin Avenue and said he was wanted—he wanted to give himself up, that he was wanted for the murder of his stepdaughter, Margaret Nowicki.

The report contained no reference that defendant actually admitted to killing his stepdaughter. Officer Parys contended that there was no discrepancy between the report and his testimony; that defendant did admit to killing her; and that the defense attorney had misinterpreted the aforesaid words of the report. In light of the fact that the jury had an opportunity to consider whether or not the aforesaid report contradicted the testimony of Officer Parys with regard to defendant's oral confession, we find that no prejudicial error was committed by the trial judge in refusing to order the notebook to be produced in court. We also find defendant's contention

with regard to the cross-examination of other witnesses to be without merit.

■■ (e) In support of his contention that the prosecution's closing argument was prejudicial, defendant alludes primarily to the prosecutor's query: "What does he justly deserve for raping her?" An objection was sustained and the jury was immediately instructed to disregard the remark. At the time of the murder Margaret Nowicki was only fourteen years old and sperm had been found in her. Under the law in force at that time Margaret Nowicki would have been raped if a male had carnal knowledge of her, with or without her consent (Ill Rev Stats 1959, c 38, § 490). According to the State's evidence the decedent had been severely beaten and sperm was found in her vagina. Evidence was also adduced to the effect that her body was found clad only in a torn white blouse or pajama top and a pair of panties which were inside out and backward; defendant had been in her bedroom while the decedent was still in bed, tussling with her and applying a rope to her wrists allegedly to pull her out of bed; on various occasions defendant wanted his stepdaughters to "really kiss him" and not to kiss him like one kisses a father. (According to defendant's testimony, "Margie was a good girl. She did not date very often.") Statements of counsel and argument based upon proven facts and circumstances, or upon legitimate inference therefrom, do not exceed the bounds of proper debate and are not to be discountenanced by the courts. People v. Miller, 13 Ill2d 84, 148 NE2d 455. In view of the admonition of the trial judge and under all of the circumstances of this case, we do not believe that this remark was sufficient to prejudice the jury.

■ Defendant attempts to raise on appeal for the first time the alleged prejudicial nature of other statements made by the prosecutor. However, since no ob-

jection was made at trial the issue is waived. People v. Winters, 29 Ill2d 74, 80, 193 NE2d 809; People v. Switalski, 394 Ill 530, 69 NE2d 315.

After considering all of defendant's properly raised assertions of impropriety, we find no merit in his contention that the prosecutor's closing argument was prejudicial.

■ (f) Defendant argues that the court improperly prevented him from calling to the jury's attention the deficiency in the evidence offered by the State to meet his affirmative defense of insanity; and that the natural consequence was to imply to the jury that it was the court's opinion that the evidence of insanity had been sufficiently rebutted. The pertinent statement of defense counsel was:

> . . . Dr. Haines told you that based upon the question that we asked, it was his opinion that the hypothetical person, and I don't think you have to be a mindreader to know who the hypothetical person is, the hypothetical person did not understand at that time the difference between right and wrong and he had no power of selection.
>
> Of course, if the facts in the question are not true, then the doctor's opinion isn't true. That is obvious and no one is going to fool you. But have you heard any evidence to the contrary? You have heard fairy tales. You have heard fiction. You have heard some of his dreams but you haven't heard any evidence to the contrary.

An objection was sustained as to that portion of the argument relating to "fairy tales," "fiction," and "dreams." The jury was subsequently instructed to make no inference from any of the court's rulings. We find no merit in the argument that defendant was prejudiced by the sustention of the prosecutor's objection.

50

■ Defendant also claims that in his argument he was not allowed to question the probative value of the photographs of the decedent lying on the floor. That portion of the closing argument in question is as follows:

Now, let's forget for a moment the evidence as to having anything to do with the death and let's see what evidence they have of a sexual assault because what they are trying to do to you, and I will say that I haven't tried that many cases, but I have never seen such bloody and gory pictures offered by the State to a jury, because what do they tend to prove.

An objection to the aforesaid was sustained. The court merely precluded defense counsel from offering personal testimony and questioning the admission of the photographs. The trial judge did not preclude counsel from questioning the probative value of the photographs had he proceeded in the proper manner and therefore no error was committed.

■ (g) As to instructions, defendant first complains of Instructions Nos. 5 and 6, submitted by the prosecution. Each of these concerned the definition of malice under the old statutory definition of murder as a killing with malice aforethought. Instruction No. 6 was a recitation of the statutory provision (Ill Rev Stats 1959, c 38, § 358), and included the language that "malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." Defendant argues that this instruction conveyed the erroneous implication that all instances in which one person takes the life of another without prior provocation involve malice aforethought within the contemplation of the statute. Defendant argues that instruction No. 5 was defective in the same manner. It provides:

51

The Court instructs the jury, as a matter of law, that the words "malice aforethought" do not necessarily imply the lapse of considerable time between the malicious intent to take life and the actual execution of that intent; whether the design to effect death was formed on the instant or had been previously entertained is immaterial, for the malicious killing, if proven by the evidence beyond a reasonable doubt, in either case is murder under the law of this State.

In support of his argument defendant relies upon People v. Penman, 271 Ill 82, 110 NE 894, and People v. Jarvis, 306 Ill 611, 138 NE 102. However, in each of those cases the instruction was condemned because it wholly ignored the defendant's plea of self defense. In the instant case no defense of the defendant is ignored in giving those instructions and therefore we find that no error was committed.

■■■■ Defendant also urges that under the circumstances the court erred in refusing to substitute Defendant's Instruction 17 in place of People's Instructions 5 and 6. It provides:

The jury are instructed that "malice aforethought" is an essential element of the crime of murder and the prosecution must prove beyond all reasonable doubt such malice aforethought. While malice may be presumed where one person deliberately injures another, it is the deliberation with which the act is performed which gives it character. Malice is the opposite of an act performed under uncontrollable passion, which prevents all deliberation or cool reflection in forming a purpose, and if you believe from a consideration of all of the facts and circumstances in evidence in this case that the prosecution has failed to prove beyond all reasonable doubt that the defendant acted with malice afore-

thought you must find the defendant not guilty of murder.

The elements of that instruction were criticized by the court in People v. Spranger, 314 Ill 602, 613, 145 NE 706, and therefore we find no error in the court's ruling. No other instruction as to the definition of malice was tendered by defendant.

 Defendant next argues that People's Instruction No. 3 imposed upon the jury the duty to find him guilty in the absence of reasonable doubt of his innocence. The instruction provides in relevant part that:

> If you are convinced from the evidence in the case beyond all reasonable doubt that the defendant is guilty as charged in the indictment, it is your duty to find such defendant guilty. If you are not convinced from the evidence beyond all reasonable doubt of the guilt of the defendant, it is your duty to find such defendant not guilty.

The instruction does not require the jury to find defendant guilty in the absence of a reasonable doubt of his innocence, and was therefore proper.

Defendant alludes to various other purported errors in the instructions given, and refused to be given, to the jury. After a thorough examination of his arguments we find that no prejudicial error was committed.

 (h) With regard to defendant's final point, we find that the trial judge was neither prejudiced against nor hostile to defendant.

### Holding on Appeal

 Counsel for defendant has meticulously scrutinized the record and, after retrospectively evaluating the innumerable rulings of the court and the lengthy arguments of the prosecution, urges in this appeal many errors. These comprise generally, among others, of restricted cross-examination, prejudicial comments and the

role of the judge. The purpose of review in a criminal case is not to decide whether the record is perfect, but to determine whether the defendant had a fair trial free from substantial and prejudicial errors, and whether his conviction is based upon evidence establishing his guilt beyond a reasonable doubt. People v. Caldwell, 79 Ill App2d 273, 224 NE2d 634. After a careful consideration of all the circumstances of the instant case, we are not convinced that defendant was prejudiced by any action of the judge or prosecutor. The jury returned a just verdict; indeed it was the only reasonable conclusion to reach upon the basis of the evidence adduced. We find that defendant received a fair trial; that the verdict is supported by the evidence and no prejudicial error intervened to require a new trial. The judgment of the trial court is affirmed.

Affirmed.

ENGLISH, P. J. and McCORMICK, J., concur.