THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALOISIOUS G. ZEMOLA, Defendant-Appellant.

(No. 55858;

First District—December 18, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Judith Smith Leland and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and William D. Wolter, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE EGAN delivered the opinion of the court:

The defendant, Aloisious Zemola, was found guilty of murder by a jury in the circuit court of Cook County. He was sentenced to a term of fourteen to twenty years in the penitentiary. The defendant contends on appeal: the evidence did not establish his sanity at the time of the killing beyond a reasonable doubt; the murder conviction should be reduced to manslaughter; the sentence should be reduced.

The facts leading up to the occurrence are not disputed. The defendant and the deceased had been married for twenty-three years and had seven children. He was forty-seven years old at the time of the killing and worked as a truck driver; she was employed full time. In 1964 they had separated for a period of nine months; the three oldest boys lived with him and the other children with her. After they resumed living together in Midlothian they had many disputes over finances and the children. She accused him of infidelity. He never threatened or struck her. He had been in the Army for almost three years and acquired a Luger pistol while serving in combat in Europe. He kept the loaded pistol in his bedroom. In 1964 a beam falling from a roof struck him on the head requiring two or three stitches. He received emergency treatment and did not lose any time from work.

On August 18, 1969, he came home from work at 7:30 P.M. and fell asleep while watching television. His wife and four younger children were home. The children woke him up to talk to two Navy recruiters who wanted to talk about his oldest son, whose enlistment was running out. He and his wife discussed the possible enlistment of another son then in the Audy Home, who had been in trouble often. The defendant had two cans of beer with the recruiters.

Gregory Zemola, who was thirteen at the time of trial, testified that after the recruiters left his father had two canned martinis. His mother and father began talking about school tuition and a pony the children kept behind the house. His father's voice became louder; his mother's remained normal. Gregory went to bed in a room he shared with his two sisters, thirteen and five, and his brother, two. He was awakened by his mother, who told him his father had broken up some plants and

furniture. His father came to the doorway, left and made a number of phone calls. The defendant dialed for information and then a few police stations. After the phone calls the defendant came into the room with the Luger pistol inside his belt. He told Gregory and the older girl to take the other children and get out of the house because they were on their own. Gregory remained in the room while the other children went next door. His father told him he had better get out of the house. His mother was sitting next to Gregory on the bed holding his hand. His father fired four shots from a distance of three or four feet all of which struck his mother, who fell off the bed onto the floor. His father then told Gregory to leave three times. He fired one more shot, but Gregory didn't know where it went. Gregory then ran a few blocks and called the police. He described his father's eyes as "kind of gray and bloodshot, they appeared to be glassy."

The Sheriff's Police arrived and were told by the defendant they could come into the house. They told the defendant to come out several times; he told them to let his children out and he would come out behind them. The defendant fired three shots one of which struck the windshield of a car parked where the police were standing. After the police ascertained that all of the children were out of the house, they fired tear gas cannisters into the home. The defendant came out, was arrested and handcuffed.

One officer testified that the defendant at the scene said he didn't know what was going on and asked why all the police were there. Later at the station he saw the defendant dial a telephone and heard him talk to someone. In his opinion the defendant was not intoxicated.

Randall Zemola, who was twenty at the time of trial, testified that he arrived at his home when the police were handcuffing his father. When he asked him what had happened, his father said nothing and just looked at him. When the officers asked his father when he got the guns, the defendant said, "What guns?" At the station when Randall asked him if his mother was dead, his father said, "Don't listen to it unless you see the body." When his father was in the cell he was not responding to the questions being asked by the police. His father's speech sounded like he was drunk or in a state of shock.

The defendant testified that he remembered walking into the house with his wife after the recruiters left. The next thing he remembered was being in the squad car with the police. He didn't remember seeing Randall at all that night, nor did he remember making any phone calls. He did not intend to shoot his wife; he loved her very much.

Dr. Marvin Ziporyn, a psychiatrist, testified for the defendant. He examined him on August 17, 1970, in the county jail for forty-five minutes

to an hour. He made a diagnosis of non-psychotic organic brain syndrome associated with cerebral trauma. Non-psychotic means there is no departure from an awareness of reality. Organic brain syndrome means that there is a complex of symptoms which are associated with permanent, irreversible damage to the actual tissue of the central nervous system, specifically the brain. The cause of this damage was some kind of external force or blow applied to the head. In the course of his examination the defendant gave him a detailed account of his marital difficulties. In response to a hypothetical question he gave his opinion that the hypothetical person could appreciate the criminality of his conduct but could not conform his conduct to the requirements of law. In his opinion the condition of the hypothetical person is permanent. In the history given to him by the defendant, in addition to the injury to his head in 1964, the defendant told him that he had suffered a knockout in 1950 or 1951 when he was boxing. Also in the history the defendant told him that he had blacked out on quite a number of previous occasions.

Dr. Rigoberto Rodriquez, a psychiatrist, testified on behalf of the State. He examined the defendant in the jury room of Judge Wilson's chambers on January 5, 1970. He had talked to the defendant's sisters before the examination. His examination was a clinical, psychiatric examination consisting of questions which are intended to determine the person's ability to relate to people and to things, his contact with reality, his memory, reasoning, and information about events in the country. He asked the defendant to explain why he was in jail and what had happened. The defendant gave him a narrative of what happened which caused him to be where he was. Neither on direct examination nor on cross-examination was it disclosed what the narrative consisted of. His diagnosis was that the defendant was a passive-aggressive personality without psychosis. During the direct examination of Dr. Rodriquez the following occurred:

"State's Attorney: Q. Based upon your examination and expertise in the field of psychiatry, Doctor, do you have an opinion as to the defendant's ability to ascertain the distinction between right and wrong?

The Witness: A. Your Honor, is hard for me as psychiatrist to—

The Court: No, answer it. If you can't answer it, say so.

State's Attorney: I will rephrase it, Your Honor.

Q. Would the defendant be able to understand that a person who takes the life of another performs an act which would therefore be contrary to the law and wrong as opposed to being a right type of act?

Mr. White: Judge, I object.

The Court: Sustained.

State's Attorney: Q. Based upon your examination and experience in the field of psychiatry, do you have an opinion as to the sanity of the defendant, Aloisious Zemola?

The Witness: A. I do.

State's Attorney: Q. What is that opinion, Doctor?

The Witness: A. As I stated in my report, my opinion was he was not psychotic. Now, I understand that legal term of society is something the psychiatrist doesn't always understand or doesn't always use the terminology. But in my opinion he was not insane.

State's Attorney: Q. Does that opinion—would that opinion be the same—that would be your opinion on the date you examined him, is that correct?

The Witness: A. Yes.

State's Attorney: Q. Do you have an opinion as to the sanity or insanity of the defendant, Aloisious Zemola, at the time the act, killing of Mrs. Zemola was committed on August 19, 1969, based upon your examination and experience in the field?

The Witness: A. The—my opinion can only go as far as what he reported to me, and based on what he reported to me he was not insane.

\* \* \*

State's Attorney: Q. You would characterize Mr. Zemola as that type of person?

The Witness: A. At the time of examining him my opinion was the diagnosis was passive-aggressive personality.

State's Attorney: Q. He be the type of man keep his anger in for a period of time and then under certain conditions he might let it all out, explode, blow his top, in other words?

The Witness: A. That is correct.

State's Attorney: Q. Would that party who had that personality at the time say he blew his top would not be insane under the terms you have explained here?

The Witness: A. It would be what?

State's Attorney: Q. He would not be insane under the terms we have been using in this courtroom?

The Witness: A. No, not in my opinion."

The defense argues that since Dr. Ziporyn testified in answer to a hypothetical question that the defendant was unable to conform his conduct to the requirements of law, the presumption of sanity ceased and the prosecution was required to prove sanity beyond a reasonable doubt. Assuming the sufficiency of Dr. Ziporyn's testimony, with this proposition

of law there can be no dispute. *People v. Skeoch* (1951), 408 Ill. 276, 96 N.E.2d 473; *People v. DePompeis* (1952), 410 Ill. 587, 102 N.E.2d 813.

The defendant argues further that the testimony of Dr. Rodriquez failed to rebut the evidence of the defense because:

1. Dr. Rodriquez had examined the defendant one year after the event only as to his competency to stand trial and not to determine his sanity at the time of the occurrence;

2. Dr. Rodriquez' opinion was not based upon a hypothetical question encompassing all the relevant facts;

3. Dr. Rodriquez rendered his opinion only in the imprecise lay terms of sanity-insanity but was not asked whether the defendant could conform his conduct to the requirements of the law.

■■ In support of his first ground the defendant cites *People v. Taylor* (1971), 1 Ill.App.3d 1053, 275 N.E.2d 717. In that case the psychiatrist testifying for the State examined the defendant, as here, for the purpose of determining competency to stand trial. Unlike this case, however, when asked for an opinion as to the defendant's sanity at the time of the offense, the witness refused to give an opinion. The defendant has not cited, nor have we been able to find, any case which excluded an expert opinion of the mental condition of a defendant at the time of the commission of the act because the examination took place some time after the occurrence for the purpose of determining competency to stand trial. In the *Taylor* case itself, the court said at p. 1061:

> "We consider that the *Count* case does not proclaim a rule of law that no doctor can properly testify to his opinion of a defendant's sanity at the time of the crime based upon a subsequent examination. Surely there are many cases where this has been done and upheld. See, for example, *People v. DePompeis* * * *."

In *People v. Jackson* (1969), 116 Ill.App.2d 304, 253 N.E.2d 527, the examination occurred nine months after the act; in *People v. White* (1970), 131 Ill.App.2d 652, 264 N.E.2d 228, three weeks; in *People v. DePompeis* (1952), 410 Ill. 587, 102 N.E.2d 813, five weeks. (Dr. Rodriquez' examination was five months after the occurrence, not one year as the defendant contends.)

■■ The defendant now argues that Dr. Rodriquez' opinion is entitled to no weight because he was not asked a hypothetical question embracing all the relevant facts citing *People v. Black* (1937), 367 Ill. 209, 10 N.E.2d 801. Contrary to the defendant's contention that the Supreme Court held it was erroneous not to put a hypothetical question to the examining psychiatrist, the court did hold that an objection to an opinion of the examining psychiatrist which was based on matters reported to him privately by others and never brought before the jury should have

been sustained. Dr. Rodriquez was an examining psychiatrist and rendered his opinion based upon his own personal observations of the defendant and what the defendant told him. Under these circumstances a hypothetical question is not required. *People v. White* (1970), 131 Ill.App.2d 652, 656, 264 N.E.2d 228.

■■ The last ground asserted in opposition to Dr. Rodriquez' testimony is that the witness did not express an opinion whether the defendant lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; rather, his opinion was that the defendant was "not insane."

Unfortunately, the practice of couching the question and the answer in terms of "sanity" and "insanity" has persisted over the years with rugged endurance despite efforts to end it. (*People v. Lowhone* (1920), 292 Ill. 32, 126 N.E. 620; *People v. Geary* (1921), 297 Ill. 608, 131 N.E. 97; *People v. Krauser* (1925), 315 Ill. 485, 146 N.E. 593; *People v. De-Pompeis* (1952), 410 Ill. 587, 102 N.E.2d 813; *People v. White* (1970), 131 Ill.App.2d 652, 264 N.E.2d 228. See Am. Jur. Proof of Facts Ann. Vol. 8, Proof 1, page 27.) In this case itself, the record reflects the extreme reluctance of the psychiatrists to render their opinions in such terms. "Sanity" is a legal term susceptible of different tests depending on the cause of action, *e.g.*, competency hearing; post criminal trial; will contests; commitment proceedings. The question was as improper as asking whether a personal injury defendant was negligent. However, no objection was made to the question or answer.

In *People v. White* (1970), 131 Ill.App.2d 652, 264 N.E.2d 228, a psychiatrist testified for the prosecution that he examined the defendant twenty days after the alleged crime; his examination took between one to two hours; during this period he discussed with the defendant his activities on the day in question. The prosecutor then read the definition of insanity from the statute and asked the witness based on his conversation with the defendant, his years of experience in the field of psychiatry, and upon a reasonable degree of medical certainty, whether or not in his opinion the defendant was insane on the morning in question. The witness answered, "According to the definition of the statutes and other stipulations which the State's Attorney has made, he was not insane." No objection was made. To the claim of error in allowing the testimony of the witness the court said:

> "When a defendant fails to make an objection during the trial he cannot urge this as error for the first time on appeal. (*People v. Trefonas*, 9 Ill.2d 92, 98, 136 N.E.2d 817). As pointed out in the *Trefonas* case an objection signifies that there is an issue of law and gives notice of the terms of the issue. Unless an objection to

admission of evidence is made at that time it is regarded as waived. The court also pointed out that a party cannot sit by and permit evidence to be introduced without objection and then upon appeal raise an objection which might have been obviated if made at the trial. The reason for the rule is apparent. If an objection was made in timely fashion in the instant case, the prosecutor could have asked additional questions to cure any defect the defendant now complains about on his appeal."

The defendant has waived any objection to the admissibility of the testimony of Dr. Rodriquez and the jury was entitled to give it such weight as it deemed appropriate.

■■ Assuming for the sake of argument only, that a timely objection to Dr. Rodriquez' opinion had been made, the conclusion that the presumption of sanity had been overcome as a matter of law would not be correct.

In *People v. Conrad* (1967), 81 Ill.App.2d 34, 225 N.E.2d 713, the defendant testified, as here, that he had no recollection of the actual killing and that he had blacked out. The psychiatrist testified in response to a hypothetical question embodying the defendant's version of pertinent evidence that the hypothetical person was unable to distinguish between right and wrong or to choose whether or not to do an act. On cross-examination the witness said that the hypothetical person was unable to choose between right and wrong only at the time he blacked out. The State offered no psychiatric evidence to rebut this testimony. The court held that if the jury did not believe the defendant's testimony as to the blackout the witness' answer to the hypothetical question would be of no significance in establishing insanity. The court further said that since the jury could have disbelieved the defendant's testimony as to the blackout the question was properly submitted to the jury. See also *People v. Turner* (1971), 2 Ill.App.3d 11, 275 N.E.2d 742.

In *People v. Count* (1969), 106 Ill.App.2d 258, 246 N.E.2d 91, the psychiatrist examined the defendant eleven months after the robbery; he gave an opinion that the defendant suffered from an impulse character disorder and lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

The witness testifying for the State said that neither he nor any other psychiatrist could form an opinion as to the defendant's sanity merely from an examination made after the crime since anything the defendant then said would be self-serving. The court held that the State psychiatrist contradicted the testimony of the defense psychiatrist to a sufficient degree to support the submission of the issue to the jury.

We find the rationale of these cases applicable here. Dr. Ziporyn's

opinion was based on his diagnosis that the defendant was suffering from traumatic brain damage. His opinion was based solely on what the defendant told him in the forty-five minute interview. There were no objective symptoms. (See *People v. Hester* (1968), 39 Ill.2d 489, 237 N.E.2d 466.) He attached no medical importance to the defendant's claim of blackout. When the defendant in the course of his narrative told him that he had blacked out but did not deny shooting his wife, the witness, in his own words, "Since my function was not to elicit the criminal aspects of the matter * * * pressed it no further." No physical examination of any kind was conducted.

Dr. Rodriquez testified that common medical practice requires an electroencephalogram be administered whenever brain damage is suspected; it is the first test given and is "a pretty reliable form of detection." He found no evidence of brain damage. He also testified that if a patient complained of blackouts due to injury to his head, he would withhold diagnosis until the records of the injury were made available to him. If the fact finders accepted this testimony from Dr. Rodriquez, apart from his ultimate opinion, they had the right to reject the diagnosis of Dr. Ziporyn that the defendant had suffered brain damage.

In addition to the medical testimony other evidence supports the finding of the jury. The defendant had no previous history of mental problems; at the time of the occurrence he took steps to get the children out of the house; when the police came he tried to dissuade them from doing anything by falsely telling them the children were still in the house; he tried to lure the police into the house and fired at least one shot at them; he was able to dial a telephone number. His conduct, it may be fairly argued, was that of man under control. Under all of the evidence the jury could conclude that the defendant at the time of the crime was sane beyond a reasonable doubt.

■■ The defendant next contends that the evidence at most suggests the defendant may be guilty of voluntary manslaughter. The essential elements of the offense are that the assailant must be acting under a "sudden and intense passion resulting from serious provocation by the individual killed." Ill. Rev. Stat. 1972, ch. 38, par. 9—2.

The jury was instructed on the elements of voluntary manslaughter and a verdict submitted to them. There was no evidence to show that the defendant acted under a sudden or intense passion resulting from a serious provocation from his wife or anyone else. We see no reason to gainsay the jury's rejection of this argument of the defendant. (*People v. Davis*, 35 Ill.2d 55, 61, 219 N.E.2d 468.) The cases cited by the defendant are factually inapposite.

■■ The defendant's last contention is that his sentence was excessive.

The trial judge, who heard the evidence of the trial and in mitigation, sentenced the defendant to the lowest minimum possible and a maximum which is not excessive under the facts. *People v. Westley* (1972), 5 Ill.App.3d 668, 284 N.E.2d 17.

The judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and BURKE, J., concur.