THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MARY LOUISE BANKS, Defendant-Appellant.

(No. 57709;

First District (1st Division)—February 11, 1974.

James J. Doherty, Public Defender, of Chicago (Bernard L. Schwartz and Ian Levin, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Jerald A. Kessler, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE EGAN delivered the opinion of the court:

Mary Louise Banks was convicted of the murder of Willie McNeal after a bench trial and sentenced to 15 to 25 years. The issues are whether the State proved her sanity at the time of the killing beyond a reasonable doubt and whether certain actions by the trial judge deprived her of a fair trial.

On December 9, 1970, at 10:00 A.M., Officer Robert Kussy received a call to investigate a homicide at 1934 West Jackson Boulevard in Chicago. He went to apartment 326 where he found the body of Willie McNeal lying on the floor behind the bed. There was no one else inside the apartment. The deceased was lying on his stomach with three bullet wounds in his back. There were five .25 caliber casings and one expended bullet on the floor.

The defendant walked into the 12th District Police Station at 10:00 A.M. and asked Officers Raul Flores and Wayne Wiberg if they were police officers. When they told her they were, the defendant took a .25 caliber automatic pistol out of her purse and gave it to Flores, stating that she had just shot a man at 1934 West Jackson. She was placed under arrest and advised of her constitutional rights. Flores then asked her why she had shot the man and the defendant answered that he was attempting to force his affections on her.

About two hours later she was questioned by Investigator Thomas Blomstrand. She told him that the deceased had been her boy friend up until five weeks before, that he been telling other men in the building about their sexual relations in the past; these men in turn were bothering her, and she could not take it anymore; and she went into the room and

shot him. She also said that these men in the building had forced her into a State hospital.

On the morning of December 9, Sylvester Washington, the janitor at 1934 West Jackson, saw the defendant come down from the upper floors. She had a little pistol in her hand and said, "Call the police. I just shot Willie McNeal." She then walked out of the building.

About four to six weeks before the shooting, Delores Neal, who knew the defendant and McNeal, saw the defendant point a gun at him and heard her shout obscenities and threats to kill him.

The three bullets recovered from the body of McNeal had been fired from the gun the defendant gave the police.

The defendant testified concerning various events in her life starting with early childhood: Her mother died when she was only six weeks old, and she saw her father only twice. She lived with various relatives. In grammar school she was suspended two weeks before graduation for fighting with a teacher during recess. When she was in junior high school, one of her aunts accused her of certain actions with boys, but she denied it. Her aunt kept accusing her, and one Sunday evening she went after her aunt with a hammer. She became pregnant for the first time when she was sixteen. She did not want the baby, but her family talked her into marrying the child's father. The marriage lasted about three weeks; and she went back to live with various relatives but did not get along with them. When she was eighteen, she was living with an aunt but left after arguing with her over the hours she (the defendant) kept. She did not take the child with her. She then began living with various men and eventually married Robert Spieler at the suggestion of her case worker. She was not really happy with her husband but stayed with him because she had seven children by him. They physically fought quite often, and she decided to leave him. She got an apartment and took six of her seven children with her. She was not working and would go out late at night leaving her children unattended in order to avoid her husband.

She moved from apartment to apartment staying in each a relatively short time. Eventually, she went to stay with an aunt, but they got along so badly that the defendant left for about a month without taking the children. During this period she went to taverns, met various people and stayed at their apartments. She took her children back and began living in apartments and with relatives but only for a short period of time. She then met Bilbo Davidson, went out with him once, was intimate with him and as a result had twins. She saw Davidson during her pregnancy, told him he was the father and his response was, "Tough."

After the children were born, she left her apartment since suddenly

everyone in the neighborhood began acting peculiar and different toward her and her family. Her oldest daughter and a neighbor's daughter got in a fight with razor blades, and afterwards things in the neighborhood became worse. "They" started picking on her, and she kept her children out of school. Early on a Sunday morning in June of 1968, she intentionally set fire to her apartment to get even with the people in the neighborhood who were persecuting her. She was arrested and taken to a hospital for observation.

Welfare sent her and her children to live in a mission on Grand Avenue. While at the mission, she was looking for an apartment, and the lady that ran the mission became angry at her because she would go out and leave the children. She left the mission, took the children to a church and sent them in with the oldest child. The church called the police, and the children were placed in a foster home. She was told that if she found another place to stay she could have her children back. She looked for an apartment for about two months but could not find anything. In the meantime, she was staying with friends and sometimes in motels. The defendant then went to a doctor, obtained some sleeping pills and tried to kill herself because she was tired and depressed. Her aunt came to the hotel and took her to the hospital. She stayed there for about a week. She was then sent to the psychiatric ward of County Hospital and from there went to Chicago State. They would not accept her there, and she was released. She then moved into the hotel.

She met Charles Banks in 1968 in the Congo Lounge. She became intimate with him; and they had many fights which he started. The first time that he attacked her was after they had intercourse at a friend's house. He suddenly started beating her. The second time that he attacked her was after she stabbed him. She waited all night for him in the hallway of his building with a small pocket knife because he had been mean to her. In the morning she went into his bedroom and stabbed him. After she stabbed him they had a fight, and she fell from the second floor window. Both of them went to the hospital, but she was never arrested as a result of this incident. She met Banks later, and he attacked her with a stick. After that incident, she saw him one night in the Congo Lounge. Banks came in with his girl friend, and the defendant was there with her boy friend. Banks started picking on her boy friend and she got up to leave. She was "kind of high" and bumped into Banks' girl friend. Banks then came out of the lounge and beat her up for hitting his girl friend. On another occasion at the Congo Lounge she went to the back of the room where Banks was sitting with his girl friend and stood in front of the bathroom door. The defendant called to him and he started toward her. Banks' brother was in the lounge and warned him that the

defendant had a gun. The owner of the lounge came between them. She had the gun in her pocket with her finger on the trigger, but had no intention of using it. The owner of the hotel grabbed her arm and pulled the trigger. She carried the gun because she was afraid of Charles Banks. She was convicted of unlawful use of a weapon, spent five days in the House of Correction and was given two years probation.

She was intimate with Banks quite a few times and gave birth to his child. She was upset because the child was deformed. The child remained in the hospital and lived for only about five weeks. During this time she went to visit the child, but she was at home when she found out that the child had died. She went down to the hospital to sign some papers and was brought to the morgue to see the child. She did not believe that the child was dead but thought that they had the child under sedation in order to take the child from her, as they did the other children. Even now, she is not positive that the baby is dead. Later, whenever she was not feeling up to par, she would call the hospital and ask questions. She felt that they "got wise" to her and would not tell her anything. She called the hospital quite often to make trouble for them. Eventually she stopped calling when someone complained about her use of the phone and her landlord took it out. After her baby died, she went down to welfare to talk about it and ended up attacking one of the case workers who had been mean to her. A warrant was made out for her arrest, but the defendant gave herself up and spent the night in jail.

She had various jobs after the baby died. One of them was at Chicago Book where she was fired for arguing with her supervisor. There was always something with the men at Chicago Book. They were chasing her all around the place. She went out with a Charles Barner, who worked there, and was intimate with him. She felt that if she was to keep her job there, she had to go along with whatever he said. Afterward, she did not have any more trouble on the job, but everyone, the men in particular, started watching her.

She met Willie McNeal in August of 1970. He worked at the desk in the lobby of the Alamac Hotel, where she was living. McNeal kept pestering her to go out with him. Finally, she agreed and went to his apartment and had intercourse. McNeal asked her again on other occasions, but she refused. She still talked to him for a while, but they began to have arguments over trivial things. She was angry at McNeal because he had told the other men in the building about their sexual relations, and they in turn started bothering her. McNeal also had asked her to become a prostitute for him. McNeal and the manager of the hotel took her to the basement one night and told her that if she did not become a prostitute for them, they would kill her.

McNeal came to her door about three weeks before the shooting and said he had to check some things in her apartment. She would not let him in, and he walked away. She left her apartment, and McNeal and some of his friends were in the hall. They started picking on her. McNeal pulled a knife and started after her. She pulled out a gun, pointed it at him and told him to leave her alone. On another occasion, she was in the lobby talking to some of the people in the building. McNeal came up and told the people he was going to kill her. She told him that she would kill him before he got a chance to kill her.

The night before the shooting she had been sitting down in the lobby practically all day without speaking to anyone. She went up to her room and started tearing up her apartment. She took a hammer and broke up the furniture. After she broke up the furniture, she went out, bought a pack of cigarettes, came back and went to bed. She did not know why she broke up her apartment; maybe she was just angry. Her money had run out, and she was waiting for her compensation check. In the meantime, the people in the hotel were harrassing her. She would meet with a group of men in the hallway at night. She was not exactly sure of what was going on except that she knew that the people in the hotel were picking on her. A week before the shooting she was not working and did not have any money. She obtained her food from Catholic Charities and would stay in her room all day. "They" would not bother her so much in her room. It was only when she came out that they would all congregate around and start looking at her. She was not talking to anyone at this time, and no one was talking to her.

She woke up the morning of the shooting and again started tearing up furniture and burning her clothes. She then went to the place where she shopped and asked for credit for lunch meat but was refused. She walked out of the store, went back into her room, changed her clothes, went to the deceased's room and knocked on the door. McNeal got up and let her in. He then went back to bed. The defendant asked him why he insisted on making things difficult for her. They started arguing. She thought that he was going to jump at her and fired the gun that she had in her pocket. She remembered pulling the trigger but did not intend to kill him. She was just trying to keep him from doing anything to her. She had bought the gun in Indianapolis, Indiana, in July of 1970. She went there by bus solely for the purpose of purchasing the gun. She usually put the gun on every morning when she got up but did not do so on the morning of the shooting. After she came back from the store she was in her apartment for about ten minutes during which time she took the gun from under her mattress and put it in her pocket.

About a week before the shooting, she was lying in bed and someone

said, "Kill Willie." That was the only time that she heard voices that she knows of, and today she still believes that she heard that voice.

After she shot McNeal, she went back to her apartment, took her coat and walked to the police station. She told the officers that she had just shot a man but did not have to tell them where the shooting took place. She had decided to go to the police after she left McNeal's apartment because she knew that she had done something wrong. After the shooting she felt that she should not have shot McNeal, but she did not go to his apartment with the intention of shooting him. She went in to discuss the matter with him, but it turned into an argument. After she had shot McNeal she knew that she had shot him that it was wrong and she did not feel well.

Dr. Richard Rappaport, a psychiatrist who is in private practice and also a consultant to the State Department of Corrections, examined the defendant on August 18, 1971, about eight months after the crime occurred in one of the secretary's offices in the Cook County Jail. The interview consisted of questions and answers and observation of the patient's behavior and lasted approximately one hour. He testified that she appeared to be able to understand his questions and gave intelligent or understandable responses to them concerning her past social history. She also talked to the doctor about the crime in question and told him that she killed Willie McNeal on the 9th of December, 1970, at approximately nine o'clock in the morning. She told him that she killed Willie McNeal by shooting him with a gun four or five times because she was afraid of him; that McNeal tried to kill her on two occasions, once with a knife and once with a gun; and that he wanted her to be a prostitute for him.

Dr. Rappaport was of the opinion that the defendant was suffering from a long-term chronic illness of psychotic nature and he diagnosed her as a chronic paranoid schizophrenic which is a functional rather than an organic disease and is classified as a mental illness. In response to a hypothetical question, the doctor gave his opinion that as a result of the mental disease or defect, the defendant, on December 9, 1970, lacked a substantial capacity to appreciate the criminality of her conduct and to conform her conduct to the requirement of law.

Dr. Robert A. Reifman, a psychiatrist and assistant director of the Psychiatric Institute of the Circuit Court of Cook County, also testified for the defense. He examined the defendant on four different occasions between March 23, 1971, and August 3, 1971, the average interview lasting about 45 minutes, and the total time he had seen her was about three hours. The first two times he saw the defendant, he determined that she was incompetent to stand trial. He saw her a third time for the

purpose of determining her sanity at the time of the alleged offense. This interview lasted approximately 45 minutes and consisted of observations, questions and answers. At that time, he had a copy of the examination that was conducted on the defendant in 1969 by his institution which found the defendant to be a paranoid personality. There was, however, no clinical evidence of any committable disease at that time. Further, he had the information relative to the arrest of the defendant for attacking a public aid worker and during the course of his examinations had read over the examinations by the people at the State hospital before coming to any finding on July 30, 1971. Based upon his observations, his interview and the above data, the witness found on July 30, 1971, that on the date of the offense the defendant could not appreciate the criminality of her acts and was unable to conform her conduct to the requirements of law.

The defendant's primary contention is that, since she introduced the opinions of two psychiatrists and the State offered only the opinion of a lay witness, Officer Wiberg, her sanity has not been proved beyond a reasonable doubt. Moreover, the defendant argues, Officer Wiberg should not have been permitted to give an opinion. This latter argument must be answered before the first issue may be resolved. At the end of the direct examination of Officer Wiberg, the following occurred:

> "State's Attorney: Q. Officer, in your opinion, can you tell the Court whether or not you are of the opinion that Mary Louise Banks was sane at the time you observed her and at the time you spent with her on December 9, 1970?
> Defense Attorney: Objection, your Honor.
> The Court: Overruled.
> The Witness: I believe so."

No question has been raised in this court of the propriety of the terms in which the question was couched. (See *People v. Zemola*, 9 Ill.App.3d 424, 430, 292 N.E.2d 195.) The objection, rather, is based in this court on the contention that no proper foundation was established for Wiberg's opinion.

Wiberg testified that he first saw the defendant about 10:00 A.M. in the 12th District Police Station and that he took her to Area 4 Homicide. He was able to understand the answers she gave to his questions, and she did not appear unusual when he saw her. He was with her for about an hour and a half. During the course of listening to her conversation and observing her behavior during that period, she appeared normal. In *People v. Lassiter*, 133 Ill.App.2d 353, 273 N.E.2d 166, the court upheld a ruling permitting an Assistant State's Attorney who had questioned the defendant for three and one half hours to render an opinion

of sanity. The cases cited by the defendant are inapposite: *People v. Patlak*, 363 Ill. 40, 1 N.E.2d 228, was reversed because the court concluded that the lay witnesses who gave an opinion were used solely for the purpose of showing conversations that proved other crimes; in *People v. Krauser*, 315 Ill. 485, 146 N.E. 593, after the witness gave his opinion, the State's Attorney said that he would omit the details of the facts upon which the witness based his opinion.

■■ The general rule is that non-experts who have an opportunity to observe a person may give their opinions of his mental condition or capacity based on facts observed, including conversations with him. (*People v. Patlak*, 363 Ill. 40, 1 N.E.2d 228.) Whether or not sufficient facts have been stated by a lay witness to support an opinion of sanity is primarily a question for the trial court to determine, and a reviewing court will not reverse unless there has been an abuse of discretion. (*People v. Wax*, 75 Ill.App.2d 163, 173, 220 N.E.2d 600.) We find no such abuse of discretion here.

With regard to the contention of the defendant that her sanity was not proved beyond a reasonable doubt, we believe that *People v. Ford*, 39 Ill.2d 318, 235 N.E.2d 576, is dispositive. In *Ford*, the defendant had been a patient at the Illinois State Psychiatric Institute from October to December, 1961. In May, 1962, she stabbed and killed her husband. In September, 1962, she was found incompetent to stand trial and was a patient at Kankakee State Hospital for over a year. Two doctors who treated here there testified that she was psychotic and had a schizoid personality. The senior psychiatrist of the Psychiatric Institute in Chicago testified that he examined her from February, 1964, until the time of trial in May, 1965. He diagnosed her as an ambulatory schizophrenic. In his opinion she had been psychotic for six or seven years before trial; and there were times when she lacked the capacity to appreciate the criminality of her conduct or to conform her conduct to the requirements of law. Her brother and two neighbors testified that in their opinion she was mentally disturbed on the day of the killing and that she lacked the capacity to appreciate the criminality of her conduct.

Four police officers who saw and talked to the defendant shortly after the killing testified that she was coherent, logical, and in touch with reality. In their opinion she was able to appreciate the criminality of her conduct and to conform her conduct to the requirements of law. The Supreme Court held that there was sufficient evidence from which a jury could find that the defendant was sane at the time of the killing.

In this case, in addition to Wiberg's testimony, Officer Raul Flores testified that he was in the defendant's presence for about a half hour. When he first saw her, she was calm and looked like she had been crying.

He could understand everything she was saying, and, as far as he could tell, she understood what he was saying.

Officer Thomas Blomstrand testified that the defendant was able to answer all the questions that he asked and he was able to understand her answers. She was crying from time to time but otherwise appeared calm.

■■ As in *Ford,* the trier of fact in this case had the right to weigh the testimony and to determine the credibility of all witnesses, experts and lay alike. He was not obliged, as a matter of law, to accept the ultimate opinions of the psychiatrists. (*People v. Zemola,* 9 Ill.App.3d 424, 431, 292 N.E.2d 195; *People v. Count,* 106 Ill.App.2d 258, 246 N.E.2d 91; *People v. Conrad,* 81 Ill.App.2d 34, 225 N.E.2d 713.) At one point, Dr. Rappaport testified that his diagnosis was based solely on the answers the defendant gave him and her reactions to the question. But he then described her as alert, well-oriented, cooperative, and unusually calm. She spoke freely and gave no evidence of anxiety or "uncomfort." Dr. Reifman testified:

> "Mrs. Banks is a different person today than she was at that time, and I don't know if her answers necessarily reflect what really is going on with her at the moment. I don't know if she really felt she was wrong at the time or wrong afterwards because this was—as she sits now in jail and reflects back, whether she knew it was wrong at that time, I don't know."

In addition, as previously noted, the defendant herself testified that after she shot McNeal, she knew she had shot him and that it was wrong.

■■ A finding of sanity by a trial court should not be disturbed unless it is so palpably against the weight of the evidence as to indicate that it was based upon passion or prejudice. (*People v. Lassiter,* 133 Ill.App. 2d 353, 356, 273 N.E.2d 166.) While few would not be moved by the piteous figure the defendant presented, we believe there is sufficient evidence in the record from which the fact finder could conclude that she was legally responsible at the time of the offense.

■■ The defendant contends that the trial judge manifested "his hostility towards, and his prejudice against the defense of insanity." In support of her argument she points to the examination of the psychiatrist by the court, and his remarks before his finding. First, no objection was made to the court's examination until after his finding. The objection, not being timely, was waived. (See *People v. Sanders,* 56 Ill.2d 241, 306 N.E.2d 865.) Moreover, in view of the nature of the psychiatric testimony, which was based mainly on interviews with the defendant, we do not believe the examination was improper.

■■ Before making his finding, the trial judge in his summation said

that the testimony raised a question only to the extent to which reliance should be placed on the type of psychiatric testimony presented. He pointed out that no tests were given and that questions and answers were used as the basis of the psychiatrists' conclusions. He said that schizophrenia, as far as he could determine from listening to the psychiatrists, is "conjectural, a theoretical, abstract conclusion based upon certain facts which the person being examined provides the examiner." He concluded that this was a "classic case which will bring sharply in focus the question of whether self-serving statements can be used as a prop for conclusions in order to avoid criminal responsibility." We see nothing wrong with these remarks. They no more than echo the expression of our Supreme Court in *People v. Hester*, 39 Ill.2d 489, 510, 237 N.E.2d 466, in upholding the rejection of psychiatric testimony:

> "It is our rule that a doctor who examines a patient merely for the purpose of qualifying as a witness ordinarily may not testify as to his medical opinions based upon subjective symptoms described by the patient because of the absence from this relationship of the normal truthworthiness accompanying symptomatic descriptions by a patient to a treating physician * * .* The evidentiary rule which limits the medical testimony of a nontreating physician to hypothetical questions has been held to apply with equal force to a psychiatrist's testimony pertaining to a patient's alleged emotional infirmity because 'most courts refuse to permit the physician to act as the patient's conduit for narrative declarations.' "

Similarly, in *People v. Count*, 106 Ill.App.2d 258, 262, 246 N.E.2d 91, the court said:

> "[The State psychiatrist] testified that no psychiatrist could make an accurate assessment of defendant's impulses at the time of a crime committed eleven months earlier. He was of the opinion that anything defendant told a psychiatrist in an examination made for the purpose of determining his legal sanity would be self-serving and unreliable. This finds support in common sense and in *People v. Hester* [citation]."

■■ The defendant also contends that the trial judge improperly used the defendant's competency at the time of trial as a standard in determining her mental state at the time of the commission of the act. The judge in his summation did say:

> "The defendant testified before the Court on two dates, for a total of approximately four and one half hours. *The Court has had the opportunity to observe the defendant while she testified.* The

Court is of the opinion that *at this time* the defendant clearly understood all of the proceedings that were taking place, there was presented a person who was intelligent and clearly could answer substantially all of the questions that were asked. The defendant exhibited considerable emotion; her personality appeared to change from time to time during the questioning that took place, but, at all times she evidenced an understanding of the questions that were being asked, and her answers were, as far as this Court is concerned, coherent and understandable." (Emphasis supplied by the defendant.)

But immediately before he made these remarks, he said:

"Based upon the issue of insanity having been raised, the State must, of course, prove beyond a reasonable doubt that the defendant, Mary Louise Banks, performed the acts which caused the death of Willie McNeal; * * *. [And] the State must prove beyond a reasonable doubt that the defendant, Mary Louise Banks, *was then sane*." (Emphasis added.)

In determining the question of sanity, surely the fact that the defendant remembered the killing and the circumstances leading up to it had some probative value. So did the fact that her testimony concerning the killing was almost identical to what she told the psychiatrists and did not contradict what she had told the police. And so did the fact that she testified that after she shot McNeal she knew she had shot him and that it was wrong. Under these circumstances, the trial judge had the right, if not the duty, to appraise the defendant as a witness, which, reading his entire remarks, we judge he did. We therefore conclude that the trial judge did not misunderstand the applicable standards and did not exhibit any prejudice to an insanity defense. The judgment of the circuit court is affirmed.

Judgment affirmed.

BURKE and GOLDBERG, JJ., concur.